## Mrs. E. M. Karr v. The State.

No. 15583. Delivered October 26, 1932.
Reported in 54 S. W. (2d) 92.

The opinion states the case.

*Dailey & Keller* and *Wm. Madden Hill,* all of Dallas, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE. — Appellant was convicted in the county court of Dallas county of violating the provisions of article 1589, Penal Code, making it an offense for employment agents engaged in providing employment for skilled, professional or clerical positions, to charge for such services a fee exceeding twenty per cent of the first month's salary. The punishment was assessed at a fine of one hundred and one dollars.

It is not necessary to discuss the facts of the case other than to state that it was shown without dispute that appellant charged more than twenty per cent of the first month's salary for securing the position for the young lady named in the complaint.

The statute under which the prosecution proceeded is assailed as being unconstitutional, it being urged that it is violative of section 19, article 1 of the Texas Constitution, and of the due process of law clause of the Fourteenth Amendment of the Constitution of the United States. We quote article 1589, as follows: "Where a fee is charged for obtaining employment, such fee in no event shall exceed the sum of three dollars, which may be collected from the applicant only after employment has been obtained and accepted by the applicant. Employment agents engaged exclusively in providing employment for skilled, professional or clerical positions may charge, with the written consent of the applicant, a fee, not to exceed 20% of the first month's salary."

Article 1584, Penal Code, defines employment agents under two subdivisions, as follows: "1. 'Employment agent' means every person, firm, partnership. or association of persons engaged in the business of assisting employers to secure employes, and persons to secure employment, or of collecting information regarding employers seeking employes and persons seeking employment.

"2. 'Employment office' means every place or office where the business of giving intelligence or information where employment or help may be obtained, or where the business of an employment agent is carried on."

We are concerned on this appeal solely with appellant's contention that article 1589, P. C., is unconstitutional. The re-

mainder of the provision of title 18, chapter 7, relating to employment agencies are not under consideration.

After the prosecution in the present case was instituted, appellant, joined by her husband, obtained, in the United States District Court, an injunction restraining the district attorney of Dallas county and other officials named in the petition from instituting future prosecutions under article 1589, P. C. Karr v. Baldwin et al. (D. C.), 57 Fed. (2d) 252. A statement of the nature of the suit is set forth in the opinion in Karr v. Baldwin, supra, as follows:

"The complainant, joined by her husband, alleges that the defendants, Baldwin, justice of the peace, William McCraw, as district attorney, James Allred, as state Attorney General, and R. B. Gragg, as state commissioner of labor, are seeking and threatening to enforce against her the provisions of an Act of the 38th Legislature of the state of Texas (Chapter 41), relating to employment agents, and that such a state law is invalid and unconstitutional, in that its provisions and requirements, when asserted against the plaintiff, are in violation of the Fourteenth Amendment to the Constitution, in that it deprives her of her property without due process of law.

"That the defendant McCraw, district attorney, declared in a public radio address that he would enforce the act and prosecute all employment agencies that were violating the same, and that on February 17, 1932, the complainant was arrested on a complaint issued out of the defendant Baldwin's court, charging her with violation of said act. That the defendants are threatening to file and preparing to file other charges against her, and that such threatened numerous prosecutions will cause her great damage and injury. That a portion of the press of the city of Dallas has, in connection with such charges, made vicious and unwarranted assaults upon her and her business. Jurisdictional allegations of amount, are made. She charges that these prosecutions will force her out of business and that her damages are incapable of measurement at law, and that she has no other method for the preservation of her business from destruction than the protection of a court of equity."

The United States District Court sustained the constitutionality of each of the provisions of the "employment agency" act, save and except that defendants were perpetually enjoined from prosecuting or interfering in any way with the right of complainant to disregard the article of the statute fixing the amount of fees that she might charge. The court refused to interfere with the present prosecution on the ground that there

was a plain and adequate remedy at law. In concluding that article 1589, Penal Code, under which the present prosecution proceeded, is invalid, the court said:

"No valid law can be passed which denies the employment agency and the citizen the right to make a contract for such fee as they may see fit. The provisions, therefore, in article 1589 and article 5215, are invalid. The right of the citizen to contract for services performed, or to be performed, when there is no disability, is highly valuable and may not be invaded by the law-making power."

In Ribnik v. McBride, 277 U. S., 350, 72 L. Ed., 913, the Supreme Court of the United States had under consideration a statute of the state of New Jersey, regulating employment agencies. It was provided that every person operating an "employment agency" as defined in the statute must procure a license from the Commissioner of Labor. The applicant for a license was required to file with the Commissioner of Labor for his approval a schedule of fees proposed to be charged for any services rendered to employers seeking employes and persons seeking employment. Further, it was provided that all charges should conform to the schedule. The schedule of fees could not be changed except with the approval of the Commissioner of Labor. The Commissioner of Labor had the authority to refuse to issue, or to revoke, any license for any good cause shown within the meaning and purpose of the act. It was shown in the opinion of the court that Ribnik complied with the conditions of the statute, but that his application was refused solely on the ground that in the opinion of the Commissioner of Labor the fees proposed to be charged in respect to certain permanent positions were excessive and unreasonable. In concluding that that part of the statute relating to the schedule of fees was unconstitutional under the due process of law clause of the Fourteenth Amendment, the court said:

"That the state has power to require a license and regulate the business of an employment agent does not admit of doubt. But the question here presented is whether the due process of law clause is contravened by the legislation attempting to confer upon the Commissioner of Labor power to fix the prices which the employment agent shall charge for his services. The question calls for an answer under the last of the three categories set forth by this court in Chas. Wolff Packing Co. v. Court of Industrial Relations, 262 U. S., 522, 535, 43 S. Ct., 630, 67 L. Ed., 1103, 1108, 27 A. L. R., 1280, that is to say: Has the business in question been devoted to the public use and

an interest in effect granted to the public in that use? Or, in other words, is the business one 'affected with a public interest,' within the meaning of that phrase as heretofore defined by this court? As was recently pointed out in Tyson & Bro.-United Theatre Ticket Offices v. Banton, 273 U. S., 418, 430, 47 S. Ct., 426, 71 L. Ed., 718, 722, [58 A. L. R., 1236], the phrase is not capable of exact definition; but, nevertheless, under all the decisions of this court from Munn v. Illinois, 94 U. S., 113, 24 L. Ed., 77, it is the standard by which the validity of price-fixing legislation, in respect of a business like that here under consideration, must be tested.

"In the Tyson & Bro.-United Theatre Ticket Offices case it was said (p. 430) [(of 273 U. S.), 47 S. Ct., 426, 428 (71 L. Ed., 718, 58 A. L. R., 1236)], that the interest meant was not 'such as arises from the mere fact that the public derives benefit, accommodation, ease, or enjoyment from the existence or operation of the business; and while the word has not always been limited narrowly as strictly denoting "a right," that synonym more nearly than any other expresses the sense in which it is to be understood.' The business must be such (p. 434) [(of 273 U. S.), 47 S. Ct., 426, 429, (71 L. Ed., 718], 'as to justify the conclusion that it has been devoted to a public use and its use thereby, in effect, granted to the public.' And again (p. 438), after reviewing former decisions, it was said that: 'Each of the decisions of this court unholding governmental price regulation, aside from cases involving legislation to tide over temporary emergencies, has turned upon the existence of conditions, peculiar to the business under consideration, which bore such a substantial and definite relation to the public interest as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use.'

"In Chas. Wolff Packing Co. v. Court of Industrial Relations, supra, p. 537, 43 S. Ct., 630, 633 [(67 L. Ed., 1109, 27 A. L. R., 1280)], it was said: 'It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the woodchopper, the mining operator or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by state regulation * * * one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances.'

"In Adkins v. Children's Hospital, 261 U. S., 525, 67 L. Ed., 785, 24 A. L. R., 1238, 43 S. Ct., 394, this court had under consideration an act of Congress fixing minimum wages for women and children in the District of Columbia. The legislation, so far as it affected women, was held invalid as contravening the due process of law clause of the Fifth Amendment, because it was an arbitrary interference with the right to contract in respect of terms of private employment. It was said (p. 546 [(43 S. Ct., 394, 397], that while there was no such thing as absolute freedom of contract, nevertheless freedom of contract was the general rule and restraint the exception; and that 'the exercise of legislative authority to abridge it can be justified only by the existence of exceptional circumstances.'

"The business of securing employment for those seeking work and employees for those seeking workers is essentially that of a broker, that is, of an intermediary. While we do not undertake to say that there may not be a deeper concern on the part of the public in the business of an employment agency, that business does not differ in substantial character from the business of a real estate broker, ship broker, merchandise broker or ticket broker. In the Tyson & Bro.-United Theatre Ticket Offices case, supra, we declared unconstitutional an act of the New York legislature which sought to fix the price at which theatre tickets should be sold by a ticket broker, and it is not easy to see how, without disregarding that decision, price-fixing legislation in respect of other brokers of like character can be upheld.

"An employment agency is essentially a private business. True, it deals with the public, but so do the druggist, the butcher, the baker, the grocer, and the apartment or tenement house owner and the broker who acts as intermediary between such owner and his tenants. Of course, anything which substantially interferes with employment is a matter of public concern, but in the same sense that interferes with the procurement of food and housing and fuel are of public concern. The public is deeply interested in all these things. The welfare of its constituent members depends upon them. The interest of the public in the matter of employment is not different in quality or character from its interest in the other things enumerated; but in none of them is the interest that 'public interest' which the law contemplates as the basis for legislative price control. Chas. Wolff Packing Co. v. Court of Industrial Relations, supra, page 536 [( 43 S. Ct., 630, (67 L. Ed.,

1109, 27 A. L. R., 1280]. Under the decisions of this court it is no longer fairly open to question that, at least in the absence of a grave emergency, Tyson & Bro.-United Theatre Ticket Offices v. Banton, supra, pp. 431, 437 [47 S. Ct., 426, (71 L. Ed., 723, 725, 58 A. L. R., 1236)], the fixing of prices for food or clothing, of house rental or of wages to be paid, whether minimum or maximum, is beyond the legislative power. And we perceive no reason for applying a different rule in the case of legislation controlling prices to be paid for services rendered in securing a place for an employee or an employee for a place.

"Brazee v. Michigan, 241 U. S., 340, 36 S. Ct., 561, 60 L. Ed., 1034 [Ann. Cas., 1917c, 522], cited by defendant in error lends no support to the judgment below. That case involved the validity of a Michigan statute in respect of employment agencies. Sec. 5 of the act (1913, Act No. 301) attempted to limit the fees which should be charged. The state supreme court held that the business was one properly subject to police regulation and control, but did not rule concerning the validity of section 5. This court held that it was within the power of the state to require licenses for employment agencies and prescribe reasonable regulations to be enforced by the Commissioner of Labor. But it was said (p. 344).

" 'Provisions of section 5 in respect of fees to be demanded or retained are severable from other portions of the act and, we think, might be eliminated without destroying it. Their validity was not passed upon by the Supreme Court of the State and has not been considered by us.'

"And we since have held definitely that the power to require a license for and to regulate the conduct of a business is distinct from the power to fix prices. 'The latter power is not only a more definite and serious invasion of the rights of property and the freedom of contract, but its exercise cannot always be justified by circumstances which have been held to justify legislative regulation of the manner in which a business shall be carried on.' Tyson & Bro.-United Theatre Ticket Offices v. Banton, supra, p. 431 [47 S. Ct., 426, 428, (71 L. Ed., 723, 58 A. L. R., 1236]. And see pp. 440, 441.

"To urge that extortion, fraud, imposition, discrimination, and the like have been practiced to some, or to a great, extent in connection with the business here under consideration, or that the business is one lending itself peculiarly to such evils, is simply to restate grounds already fully considered by this court. These are grounds for regulation but not for price

fixing, as we have already definitely decided. Tyson & Bro.-United Theatre Ticket Offices .v. Banton, supra, pp. 442-445.

"There are a number of states which have statutes like that now under consideration, and we are asked to give weight to that circumstance. It is to be observed, however, that with the exception of the decision now under review none of these statutes has been judicially considered, except in the state of California, where the legislation was declared unconstitutional. Ex parte Dickey, 144 Cal., 234, 77 P., 924, 66 L. R. A., 928, 103 Am. St. Rep., 82, 1 Ann. Cas., 428; In Re Smith, 193 Cal., 337, 223 P., 971. And it was said in oral argument, and not disputed, that, while legislation of this character existed in several states generally it was not enforced in some instances because the state's attorney general had advised that the legislation was unconstitutional. In any event, under all the circumstances, and in the face of our prior decisions, we do not regard the mere existence in other states of statutory provisions like the one now under review as entitled to persuasive force."

The following is taken from Texas Jurisprudence, vol. 11, p. 855: "The decisions of the United States Supreme Court on federal questions are conclusive on the courts of Texas; indeed, in such cases they are said to be as binding as a mandate of the constitution."

In support of the text we find cited many cases, among them being Ex parte Gilmore, 88 Texas Crim. Rep., 529, 228 S. W., 199; Ex parte Lewis, 75 Texas Crim. Rep., 320, 170 S. W., 1098.

The decisions by the Supreme Court of the United States in Ribnik v. McBride, supra, touching the power of the state to regulate fees that may be charged by employment agents, is binding upon this court. Giving it effect in the present case, it becomes our duty to order a reversal.

The judgment is reversed and the prosecution ordered dismissed.

*Judgment reversed and prosecution ordered dismissed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.